# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| MATTHEW WADE, JR., | * | |
| Plaintiff | * | |
| v. | * | Civil Action No. PWG-17-3693 |
| WARDEN KATHLEEN GREEN, *et al.*, | * | |
| Defendants | * | |
| | *** | |

## MEMORANDUM OPINION

Plaintiff Matthew Wade filed this civil rights Complaint pursuant to 42 U.S.C. § 1983, alleging various claims under the Eighth Amendment. ECF No. 1. Defendants Warden Kathleen Green, Assistant Warden Robert Hanke, Correctional Officer Christopher Cavins, Lt. K. Stuckey, and Sgt. Muncey ("Correctional Defendants") filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, ECF No. 13, and a Memorandum in Support, ECF No. 13-2. Defendants Registered Nurse Melanie Griffin and Wexford Health Sources, Inc. ("Medical Defendants") also filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, ECF No. 30, and a Memorandum in Support, ECF No. 30-3. Plaintiff has responded to both Motions. ECF Nos. 26, 26-2, 34. Defendants have not filed a reply, and the time for doing so has passed. *See* Loc. R. 105.2(a). The matter is now ripe for review. A hearing is not necessary. *See* Loc. R. 105.6.

For the reasons that follow, Correctional Defendants' dispositive Motion, construed as a Motion for Summary Judgment, is GRANTED as to Defendants Green, Hanke, and Stuckey and DENIED as to Defendants Cavins and Muncey. Medical Defendants' Motion, also construed as a Motion for Summary Judgment, is GRANTED as to Wexford Health Sources and DENIED as to Griffin. The Court will appoint counsel to represent Plaintiff.

# BACKGROUND

## Plaintiff's Evidence-Based Assertions

In his sworn Complaint, Plaintiff alleges that, upon being transferred to ECI on December 29, 2014, he was informed by Officer in Charge Andrade that he would be assigned to Housing Unit 6D. Compl. 3; *see also* Pl.'s Decl., ECF No. 26-3 (reiterating many of the facts stated in the Complaint). Plaintiff believed that he had enemies in Unit 6D, although he did not know their names. Compl. 3. Plaintiff informed Andrade that, although he did not want to be noncompliant, he was refusing to be housed in Unit 6D. *Id.* Plaintiff asked to speak with a supervisor outside of the presence of the other inmates on Unit 6D. *Id.* Andrade acceded to his request and took Plaintiff to speak with Defendant Cavins that same day. *Id.* at 3-4.

Cavins asked Plaintiff why he was refusing housing and Plaintiff "inform[ed] Cavins that there are two inmates that are housed in unit 6 D tier that are his enemies." *Id.* at 4. At Cavins' request, Plaintiff made a written statement about his concerns with Unit 6D. *Id.* In its entirety, the statement read: "I been housed in housing unit 6, unfortunately I made some enemies!! I don't feel comfortable being housed there. It's not a good way to start my stay here at ECI." Pl.'s Stmt. 3, ECF No. 1-1.

Andrade issued a notice of inmate rule violation on December 29, 2014, which Cavins "approved and signed," charging Plaintiff with disobeying an order and refusing to accept a housing assignment. Compl. 4; Notice of Violation, ECF No. 1-2. Due to the disciplinary charges, Plaintiff was "escorted to disciplinary segregation," where he spent the next "four weeks in solitary confinement locked in a cell 23 hours a day pending an adjustment hearing." Compl. 4.

On January 28, 2015, Plaintiff's disciplinary hearing was held for the December 29, 2014 charges. Defendant Muncey was the facility representative; Scott Rowe (who is not named as a

Defendant) was the hearing officer and conducted the hearing using video conferencing. *Id.* at 5.

Plaintiff alleges that,

> [b]efore the hearing took place, the plaintiff and defendant Muncey had a brief conversation regarding a plea agreement. Plaintiff Wade informed Muncey that he is pleading not guilty to the rule violations because he practically begged the officers that day to not send him to unit 6 specifically D tier because of the risks of being seriously harmed by enemies.
>
> . . . Documentation shows that Plaintiff informed Muncey that he is unable to provide both first and last names of his enemies but is very familiar with their alias (nicknames). Plaintiff made it clear that he is very aware of his enemies['] housing location because plaintiff recently was housed in Unit 6 D tier approx. 18 months prior. Muncey however failed to cooperate with plaintiff and utilize other methods to help positively identify his enemies to help his unsafe situation. Plaintiff expressed and was reasonably convincing to Muncey that there is a strong likely hood [sic] that violence would occur and he would be harmed even killed if housed in Unit 6 D tier. . . .
>
> Furthermore, plaintiff Wade explained to both Muncey and Scott Rowe . . . that he was once a suspect in a particular criminal investigation in which a man died. Plaintiff offered Muncey a chance to read paperwork to support his explanation but Muncey declined to. Plaintiff stated that the victim in that case and his enemies are close relatives. Plaintiff also stated that this is a retaliation situation because his enemies are convinced that he was a suspect and therefore somewhat responsible.

*Id.* at 5-6. Despite Plaintiff's stated concerns for his safety, Muncey failed to investigate or "respond reasonably" to Plaintiff's allegations regarding his enemies in housing unit 6D. *Id.* at 6.

The day after his disciplinary hearing, Plaintiff was returned to general population.[1] Plaintiff was informed by an unspecified officer that he would be placed in housing unit 6D. *Id.* Plaintiff states that he "questioned the officer to see if he heard him correctly because plaintiff just spent the past four weeks locked down . . . to avoid that particular unit and tier because of safety

---

[1] Plaintiff was found guilty of refusing housing and not guilty of disobeying an order. Inmate Hr'g Rec., ECF No. 13-7, at 27. Plaintiff's sanction was 15 days' cell restriction, *id.*, but he had already spent more than that amount of time on segregation pending his hearing, so he effectively received a sanction of time served.

3

reasons. Plaintiff was confused because officers are aware of his concerns for his safety." *Id.* The officer confirmed that Plaintiff would be placed in housing unit 6D. *Id.* Plaintiff does not state that the officer personally had pre-existing awareness of Plaintiff's safety concerns, nor does Plaintiff state that he personally informed the officer about his concerns.

Plaintiff was placed in housing unit 6D where, on February 13, 2015, "he was attacked by two enemies whom plaintiff made prison officials aware of." *Id.* Plaintiff reports that he was violently assaulted to the point of unconsciousness and that he sustained "several injuries" that he still suffered from at the time he filed suit in late 2017. *Id.*

Following the assault, Plaintiff was taken to the medical department, where he was seen by Defendant Nurse Melanie Griffin. *Id.* Plaintiff alleges that Griffin "very quickly scanned Wade's head and face only. Griffin failed to observe Wade's assault wounds that were beneath his clothing. Griffin failed to notice physical multiple [sic] contusions and multiple abrasions and swelling." *Id.* at 6-7. Plaintiff informed Griffin that his pain was a 10 "on a scale of 1 through 10," and asked to go to the hospital. *Id.* at 7. Griffin denied his request, and informed Plaintiff that no doctor would be at the facility for the next three days. *Id.* Plaintiff claims that

> Griffin ignored Wade's constant complaints of pain to his shoulder, lower back and head area. Griffin then gave Wade paperwork so that he could receive ice twice a day for the next 3 days until the doctor was available. Griffin also gave Wade only one pain reliever for all his injuries.

*Id.*; *see also* Med. Assignment, ECF No. 1-7.

After being seen by Griffin, Plaintiff "was escorted to the rear of the Medical Department and placed in a[n] observation cell. Per defendant K. Stuckey, Wade was placed on admin. segregation and informed that he would be seen against within 96 hours." Compl. 7; Notice of Assignment, ECF No. 1-8. Plaintiff claims that inmates on the ordinary administrative segregation unit are allowed appliances and other personal property but that he was not allowed such items,

4

"without any penological justification." Compl. 7. Plaintiff further alleges that Stuckey's decision to place him in the observation cell "wasn't warranted by any reasonable penological or psychological interest, causing plaintiff Wade increase[d] stress." *Id.* at 8.

Plaintiff alleges that he remained in the observation cell for eight days. He states that, during this time, he was denied ice, pain medication, and medical treatment, despite the fact that the observation cell was located within the medical department. *Id.* He describes the conditions of the cell as "intolerable," stating that "he was forced to live alone in a dark empty cell that exposed him to very cold temperatures" and lacked "personal amenities." *Id.* Plaintiff states that his "complaints and concerns to [unnamed] corr. officers fell on dea[f] ears." *Id.*

Plaintiff submitted a sick call request on February 19, 2015, but he was not seen by medical personnel until five days later. *Id.* at 8-9; Sick Call Request, ECF No. 1-9. At that time, eleven days after the assault, an unnamed medical provider noted that plaintiff still had swelling but did not provide any medication. Compl. 9; Feb. 24, 2015 Med. Rec., ECF No. 1-13 (stating that he would be "refer[red] to pa [physician's assistant] for further eval"). On March 5, 2015, several days after Plaintiff initiated an administrative grievance with the prison, he was seen by Nurse Practioner Kathleen Storm, who informed Plaintiff that Griffin had "failed to put in necessary paperwork for plaintiff to see a doctor." Compl. 9; *see also* Mar. 5, 2015 Med. Rec., ECF No. 1-11.[2] Storm noted Plaintiff's complaints of shoulder and lower back pain and ordered that he be referred to a provider for a follow up x-ray. Mar. 5, 2015 Med. Rec.

Plaintiff claims that former Warden Kathleen Green, Former Assistant Warden Robert Hanke, Officer Cavins, and Sergeant Muncey violated his Eighth Amendment rights by failing to

---

[2] Plaintiff's complaint states that the appointment occurred on March 4, 2015, but his attached exhibits reflect that the appointment occurred on March 5, 2015. Compl. 9; Mar. 5, 2015 Med. Rec.

5

protect him from inmate assault, despite being aware of the threat to his safety. Compl. 10-11-12. Plaintiff claims that Lieutenant Stuckey violated his Eighth Amendment rights by placing him in the observation cell with intolerable conditions. *Id.* at 11. Finally, Plaintiff claims that Nurse Griffin was deliberately indifferent to his medical needs based on her inaction after Plaintiff's assault. *Id.* at 12. Plaintiff does not clearly articulate the basis of his claim against Wexford Health Sources, but it is ostensibly an extension of Plaintiff's claim against Griffin.

**Correctional Defendants' Arguments and Evidence-Based Assertions**

Correctional Defendants argue that they were not deliberately indifferent to Plaintiff's safety because Plaintiff failed to alert them to a particular risk of harm. Corr. Defs.' Mem. 15-22. In their view, Plaintiff failed to provide adequate information to officers to facilitate investigation into his claims. They note that, at the January 28, 2015 hearing, Plaintiff described his concern as follows:

> Upon coming here to [inaudible], I knew I had enemies. I knew they were on the east side. . . . I've got a very sensitive case dealing with a homicide, got family members over here. I'm just starting my new incarceration, and I'm just trying to start off right. I ain't trying to get in no trouble. You know. I don't what this guy want to do. I don't know how connected he is. I just know I don't want to be nowhere near him. . . . I mean, I've got paperwork stating [homicide 00:03:41] [sic] and everything. It's not like I didn't want to go there because I didn't want to go there. It's my life in danger.

Jan. 28, 2015 Hr'g Tr. 3, ECF No. 13-8; *see also* ECF No. 26-5 (same). The hearing officer advised Plaintiff that his concerns about "personal safety . . . need[ed] to be addressed through the institutional level." Jan. 28, 2015 Hr'g Tr. 4.

Correctional Defendants also argue that Plaintiff made inconsistent statements regarding the nature of the threat he faced and the number of aggressors. Corr. Defs.' Mem. 19-21. Further, Correctional Defendants contend Plaintiff has never identified his assailants by "physical description, name, or consistent numerosity." *Id.* at 20. Given the lack of specificity regarding

6

either his alleged enemies or his assailants, Correctional Defendants argue that it was impossible to draw the conclusion that these two groups of people were the same. *Id.* They insist that Plaintiff did not suffer any significant injury from the assault because the medical records state that Plaintiff only suffered a bump on the head. *Id.* at 21-22.

Cavins asserts that Plaintiff "did not mention any enemies" during their December 2014 conversation or at any time afterwards, and that "[i]f Mr. Wade mentioned enemies at that time, I had the authority to assign him, and would have assigned him, to . . . administrative segregation pending investigation and identification of any enemies." Cavins Aff., ECF No. 13-6. Muncey does not remember the January 2015 hearing but states generally:

> In the event that an inmate presented concerns about enemies, I would inform the inmate to provide as much information as possible to his case manager in order to identify the enemies so that an investigation as to the needs for protection could be conducted. I most likely would also have independently contacted the case manager to provide notice of that the inmate was instructed to seek assistance in identifying and seeking appropriate measures related to those enemies. . . . If Mr. Wade had offered to show me paperwork related to his enemies, I would have referred him to his case manager for further identification and action.

Muncy Aff., ECF No. 13-9.

As to Plaintiff's conditions of confinement claim, Correctional Defendants argue that neither the conditions Plaintiff describes nor the consequences suffered amount to an Eighth Amendment violation. Corr. Defs.' Mem. 24-26. Moreover, Stuckey asserts that he "assigned Plaintiff only generally to [administrative segregation], not to a particular cell," and that he was not aware of "any defects with any of the cells on the tier to which [Plaintiff] was assigned." Stuckey Aff., ECF No. 13-10. According to Stuckey, the administrative segregation cells "were inspected three times per day, and officers made rounds every ½ hour, or, if there was a special need, then every ¼ hour." *Id.*

### Medical Defendants' Arguments and Evidence-Based Assertions

Medical Defendants argue that Plaintiff has failed to show that they were deliberately indifferent to his medical needs, insisting that the treatment Plaintiff received was appropriate for his injuries. Med. Defs.' Mem. 6-8. Further, they contend that Plaintiff has failed to allege a claim against Wexford, given that respondeat superior is not recognized in the context of § 1983 claims. *Id.* at 8-9

Plaintiff's certified medical records from February 13, 2015 to mid-March 2015 reflect that Plaintiff was seen by Griffin on February 13, 2015, following Plaintiff's assault. Feb. 13, 2015 Med. Rec. 2, ECF No. 30-4. Griffin's notes state that there was a knot on the right side of Plaintiff's scalp that was tender to the touch, but otherwise state that Plaintiff had no pain, tenderness, signs of injury or bleeding, including in plaintiff's lower back, spine, and upper extremities. *Id.* Dr. Jason Clem states that, based on these observations, Griffin appropriately treated Plaintiff with ice and that no referral to a provider was necessary. Clem Aff. 2, ECF No. 30-5.

On February 24, 2015, Plaintiff was seen by Nurse Melissa Richbark, who reported that Plaintiff complained of right shoulder pain "following [an] altercation" in which he "'fell on [his] shoulder and hyperextended it.'" Med. Recs. 8. Richbark noted mild swelling and increased range of motion; she referred Plaintiff to a physician's assistant for further evaluation. *Id.*

On March 5, Plaintiff was seen by Nurse Practioner Strom. He complained of pain in his right shoulder and lower back. *Id.* at 12. Strom ordered that Plaintiff receive an x-ray of his right shoulder and Naprosyn for his pain. *Id.* at 12-13. The x-ray revealed no evidence of fracture, dislocation, or significant abnormality. *Id.* at 14.

**STANDARD OF REVIEW**

Defendants' dispositive Motion is styled as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment under Rule 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998). Because Defendants have filed and relied on declarations and exhibits attached to their dispositive Motion, and Plaintiffs were notified of the dispositive motion, it shall be treated as one for summary judgment. *See id.*

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*,

714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10 (1986). When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 381 (2007).

## DISCUSSION

**A. Supervisory Liability (Defendants Green, Hanke, and Wexford)**

It is well established that the doctrine of respondeat superior does not apply to § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). Relatedly, a plaintiff may establish § 1983 liability for an entity operating under color of state law (like Wexford) by

demonstrating "the existence of an official policy or custom that is fairly attributable to the [entity] and that proximately caused the deprivation of their rights." *Bost v. Wexford Health Sources, Inc.*, No. ELH-15-3278, 2017 WL 1862486, at *9 (D. Md. May 8, 2017).

Correctional Defendants argue that Plaintiff has failed to state a claim against Defendants Green and Hanke, as respondeat superior does not apply and Plaintiff has not alleged that these Defendants took any action against him. Corr. Defs.' Mem. 12-13, 28. Green and Hanke state that Plaintiff did not contact either of them prior to February 13, 2015 regarding any concerns about his enemies. Green & Hanke Affs., ECF Nos. 13-4, 13-5.

Indeed, Plaintiff's sole assertion suggesting that these Defendants had knowledge of his claims is his unsupported statement in his Memorandum in Support of his Opposition that "[b]oth Green and Hanke affirmed and also reviewed Plaintiff's hearing record and disciplinary decision." Pl.'s Mem. 4, 6, ECF No. 26-2. However, the critical problem with this argument is that Plaintiff's own exhibits establish that Hanke's review[3] of Plaintiff's disciplinary hearing occurred on February 17, 2015—*after* Plaintiff had been assaulted on February 13, 2015 and moved from housing unit 6D to administrative segregation. Warden's Review of Dec. 2, ECF No. 26-6. There is no evidence that Green reviewed the record, and Plaintiff does not provide any other evidence that Green or Hanke had actual or constructive knowledge of his concerns about enemies prior to the assault.

Likewise, Plaintiff fails to allege the existence of a policy or custom as a basis for imputing supervisory liability to Wexford for Nurse Griffin's actions. Accordingly, Plaintiff's claims against these Defendants must fail.

---

[3] The record does not indicate that Green reviewed the disciplinary hearing.

**B. Failure to Protect (Defendants Cavins and Muncey)**

In order to prevail on an Eighth Amendment claim of failure to protect from violence, Plaintiff must establish that Defendants exhibited deliberate or callous indifference to a specific known risk of harm. *See Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987). "Prison conditions may be 'restrictive and even harsh,' but gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objective, any more than it squares with evolving standards of decency." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (citations omitted). "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837; *see also Rich v. Bruce*, 129 F.3d 336, 339-40 (4th Cir. 1997).

"The Eighth Amendment's prohibition on cruel and unusual punishments imposes certain basic duties on prison officials." *Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016) (citing *Farmer*, 511 U.S. at 832). Those duties "include maintaining humane conditions of confinement, including the provision of adequate medical care and . . . 'reasonable measures to guarantee the safety of the inmates.'" *Id*. "[N]ot every injury suffered by a prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015). A two-part inquiry that includes both an objective and a subjective component must be satisfied before liability is established. *See Raynor*, 817 F.3d at 127.

Objectively, the prisoner "must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury" or substantial risk of either injury. *Danser v.*

*Stansberry*, 772 F.3d 340, 346–47 (4th Cir. 2014). The objective inquiry requires this Court to "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). A genuine dispute of fact regarding the extent of the injury suffered precludes summary judgment. *Raynor*, 817 F.3d at 128.

Subjectively, a plaintiff must establish that the prison official involved had "a sufficiently culpable state of mind" amounting to "deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834. Evidence establishing a culpable state of mind requires actual knowledge of an excessive risk to the prisoner's safety or proof that prison officials were aware of facts from which an inference could be drawn that a substantial risk of serious harm exists and that the inference was drawn. *Id*. at 837. A plaintiff may "prove an official's actual knowledge of a substantial risk 'in the usual ways including inference from circumstantial evidence'" so that "'a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Raynor*, 817 F.3d at 128 (quoting *Farmer*, 511 U.S. at 842). Actual knowledge of a substantial risk does not alone impose liability. Where prison officials responded reasonably to a risk, they may be found free of liability. *Farmer*, 511 U.S. at 844.

Prison officials may not escape liability by, for example, asserting that they did not know an inmate would be assaulted by a specific inmate if they were aware that the victim was part of a targeted group and that the perpetrator attacked the victim because of his status as part of the targeted group. *Id.* at 843. "On the other hand, as the vagueness of a threat increases, the likelihood of actual knowledge of impending harm decreases. So, too, does the official's ability to respond. The ultimate measure of the adequacy of the response is therefore reasonableness in light of the surrounding circumstances." *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008) (internal citation

and quotation marks omitted).

Here, although Plaintiff did not provide a great deal of specific details (particularly to Cavins), neither Cavins nor Muncey asserted that they took any action in response to Plaintiff's complaints. Cavins stated that he had the authority to move Plaintiff to another housing unit pending investigation, and would have done so "[i]f Mr. Wade mentioned enemies at that time." Cavins Aff. However, Defendants' exhibits demonstrate that Plaintiff did, in fact, state that he had "made some enemies." Stmt. of Inmate, ECF No. 13-7, at 3. Moreover, Plaintiff stated in his verified Complaint that he told Cavins that he had two enemies in that unit. Compl. 4. Although this statement was vague, Cavins has not shown that he made even a perfunctory inquiry into Plaintiff's claimed threat to ascertain more information.

Muncey was aware of even more information about Plaintiff's reported threat; namely that Plaintiff feared family members of a homicide victim would attack him and that Plaintiff was aware of his enemies' aliases. Compl. 5. Although Muncey insists that his job duties do "not include investigation of inmate concerns about enemies" and that he "did not make housing assignments for Mr. Wade," Muncey Aff., Plaintiff states in his verified Complaint that Muncey failed to take even basic steps "by not referring the matter for further investigation" to an appropriate individual. Compl. 6.

Of note, both Cavins and Muncey stated that, if an inmate came to them with complaints about enemies, they would have taken particular steps, Cavins Aff.; Muncey Aff., and Plaintiff mentioned to both of them that he had enemies on his assigned housing unit. Compl. 4; Stmt. of Inmate. Thus, although Cavins and Muncey may not have had full details of Plaintiff's threat or responsibility for investigating inmate claims regarding enemies, Plaintiff has shown that they were aware that he had enemies in his housing using and could provide additional information

14

about them (albeit not their given names), and Defendants have not rebutted that evidence or shown that they took even basic steps—including informing the individual with the responsibility for investigation of Plaintiff's claims or even telling Plaintiff to report his claims to such an individual—in response to Plaintiff's reports of enemies. I cannot conclude as a matter of law that Defendant were not deliberately indifferent to Plaintiff's safety.

Alternatively, Correctional Defendants contend that they are entitled to qualified immunity. Yet they provide only a statement of the law of qualified immunity followed by a generic assertion that "[g]iven the status of the law as it pertains to interference with failure to protect . . . even if Plaintiff has stated a claim (he has not), Defendants' alleged actions cannot be held to have violated 'clearly established' legal rules." Corr. Defs' Mem. 11-12. Defendants fail to identify the specific right at issue or explain why their actions were not in violation of clearly established law. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). It is certainly well established that prison officials have a duty to protect inmates from a known risk of violence at the hands of other inmates. *See Farmer*, 511 U.S. at 833. Although this may be a general statement and the Supreme Court "ha[s] repeatedly told courts . . . not to define clearly established law at a high level of generality," *see Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011), Defendants failed to suggest a more specific definition of the right at issue. Therefore, Cavins and Munsey are not entitled to qualified immunity. *See Saucier*, 533 U.S. at 201. I will deny summary judgment to Cavins and Muncey.

**C. Deliberate Indifference to Medical Needs (Defendant Griffin)**

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute

and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it. . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences." *Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999). "[D]eliberate indifference requires more than ordinary lack of due care for the prisoner's interests or safety." *Id.* at 696 (internal quotation marks omitted).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992). A medical condition is serious when it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component is satisfied only where a prison official "subjectively knows of and disregards an excessive risk to inmate health or safety." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . .

16

becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). "Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 105-06; *see also Jackson*, 775 F.3d at 178 ("[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference.").

In this case, Plaintiff alleges that he was viciously assaulted, resulting in great pain, contusions, swelling, abrasions, and brief unconsciousness. Compl. 6-7. Medical Defendants do not contend that Plaintiff's allegations fail to rise to the level of an objectively serious medical need. Rather, they dispute that this was an accurate characterization of Plaintiff's medical needs, contending instead that the only injury Plaintiff suffered was "a knot on the right side of [his] scalp." *See* Med. Defs.' Mem. 7. Certainly, there is evidence that this knot was Plaintiff's only injury. Med. Recs. 2; Clem Aff. 2. But, given that Plaintiff verified the allegations in his Complaint, a general dispute of material fact exists, preventing the entry of judgment as a matter of law.

Further, as to the subjective component, Plaintiff states in his sworn Complaint that, at the medical evaluation, he repeatedly complained to Griffin of "pain to his shoulder, lower back and head area" and rated his pain as a 10 on a scale of 1 to 10. Compl. 7. Based on these allegations, Griffin was aware of Plaintiff's complaints of pain, including to his shoulder and lower back, but did nothing to respond to such complaints. While Griffin's medical notes from her February 13 evaluation of Plaintiff suggest that she was unaware of pain in Plaintiff's arm and back, Feb. 13,

2015 Med. Rec. 2, this amounts to a dispute of material fact over the subjective element of a deliberate indifference claim. Therefore, Griffin's Motion for Summary Judgment will be denied.

**D. Conditions of Confinement (Defendant Stuckey)**

Conditions which "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). "In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements—that the deprivation of [a] basic human need was objectively sufficiently serious, and that subjectively the officials acted with a sufficiently culpable state of mind." *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (internal quotation marks, brackets, and emphasis omitted). "These requirements spring from the text of the amendment itself; absent intentionality, a condition imposed on an inmate cannot properly be called 'punishment,' and absent severity, such punishment cannot be called 'cruel and unusual.'" *Iko v. Shreve*, 535 F.3d 225, 238 (4th Cir. 2008).

The objective prong of a conditions of confinement claim requires proof of an injury. "[T]o withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993). "Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003).

As to the subjective element, a prisoner must prove that officials acted with "deliberate indifference." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). Specifically, prison officials have to consciously disregard a substantial risk of serious harm to an inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Helling v. McKinney*, 509 U.S. 25, 32 (1993).

According to Plaintiff, Stuckey assigned him to an administrative segregation cell that was dark and cold; Plaintiff remained there alone and without his personal "amenities" for eight days. Compl. 8. While these conditions may have been uncomfortable, they simply do not rise to the level of cruel and unusual punishment in violation of the constitution, given that courts have found similar or more extreme deprivations to be constitutional. *See, e.g.*, *Lowery v. Bennett*, 492 F. App'x 405, 407 (4th Cir. Aug. 9, 2012) (ten-days on strip-cell confinement without "personal hygiene items, religious books, mattress, bedding, towels, and clothing" not unconstitutional); *Beverati v. Smith*, 120 F.3d 500, 504 (4th Cir. 1997) (rejecting Fourteenth Amendment challenge brought by inmates placed in administrative segregation for six months who experienced extreme temperatures, in addition to unsanitary cells and limited portions of food); *Williams v. Delo*, 49 F.3d 442, 444 (8th Cir. 1995) (four days without clothes, mattress, water, bedding, legal mail or hygienic supplies not a violation of Eighth Amendment); *Lucas v. Lowicki*, No. GJH-17-1018, 2018 WL 4384154, at * 5 (D. Md. Sept. 14, 2018) (ten days in strip cell "without a mattress, blanket and bedsheets under extremely cold cell temperature" not unconstitutional). Additionally, although Plaintiff also claims that his requests for medical attention were ignored while he was in the administrative segregation, he does not attribute this failure to Stuckey or allege that he had knowledge of the problem. Indeed, he fails to assign responsibility for this shortcoming to any individual(s).

## CONCLUSION

Accordingly, the Court construes the Defendants' dispositive Motions as Motions for Summary Judgment. The Court GRANTS Correctional Defendants' Motion as to Green, Hanke, and Stuckey, and DENIES the Motion as to Cavins and Muncey. The Court GRANTS Medical Defendants' Motion as to Wexford Health Sources and DENIES the Motion as to Griffin. Finally,

the Court will appoint counsel to represent Plaintiff on the claims that will proceed.

A separate Order follows.

February 21, 2019                                     /S/
Date                                          Paul W. Grimm
                                              United States District Judge